Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RICHARD ADAMS HOVEY,
          *Petitioner-Appellant,*

v.

ROBERT L. AYERS, JR.,* Acting
Warden, California State Prison at
San Quentin,
          *Respondent-Appellee.*

No. 03-99001

D.C. No.
CV-89-01430-MHP

OPINION

Appeal from the United States District Court
for the Northern District of California
Marilyn H. Patel, District Judge, Presiding

Argued and Submitted February 5, 2004
Submission Vacated January 4, 2005
Reargued October 27, 2005
Resubmitted August 4, 2006
Pasadena, California

Filed August 11, 2006

Before: Kim McLane Wardlaw, Richard A. Paez, and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Wardlaw

---

*Robert L. Ayers, Jr. is substituted for his predecessor Jeanne Wood-
ford, as Acting Warden of California State Prison at San Quentin. *See* Fed.
R. App. P. 43(c)(2).

**COUNSEL**

William Bennett Turner, Rogers Joseph O'Donnell & Phillips, San Francisco, California, for the petitioner-appellant.

Seth K. Schalit, Supervising Deputy Attorney General, San Francisco, California, for the respondent-appellee.

**OPINION**

WARDLAW, Circuit Judge:

Richard Hovey appeals the district court's denial of his petition for a writ of habeas corpus. He seeks relief from his 1982 conviction and sentence of death for first degree murder during the course of a kidnapping. He asserts that more than a dozen errors infected his trial, principally: denial of the due process right to be present at a mid-trial hearing on his attorney's competence; ineffective assistance of counsel at the guilt and penalty phases; *Griffin* error, *see Griffin v. California*, 380 U.S. 609 (1965); *Brady* error, *see Brady v. Maryland*, 373 U.S. 83 (1963); and exclusion of forward-looking evidence to support a proper penalty-phase jury instruction. Because Hovey admitted that he had taken the young victim against her will and committed the acts that resulted in her death, Hovey cannot demonstrate the requisite prejudice to succeed on his claims of error in the guilt phase. The district

court, therefore, correctly rejected all of Hovey's guilt-phase claims, finding a number of errors but determining that none is alone or cumulatively sufficient to merit reversal of Hovey's conviction. We hold, however, that the district court erred in concluding that the deficient performance of counsel in the penalty phase did not prejudice Hovey. Counsel's failure to investigate Hovey's mental condition at the time of the murder and to adequately prepare Hovey's penalty-phase expert witness sufficiently undermines our confidence in the verdict of death as to require us to reverse the denial of his petition as to the penalty phase. Therefore, we affirm in part and reverse in part the district court's judgment denying Hovey's habeas corpus petition.

## I.  Background[1]

On March 10, 1978, eight-year-old Tina Salazar was abducted while she was walking home from school in Hayward, California. Later that afternoon she was found by the side of a road, bound at the wrists and thighs. Doctors concluded that she had six depressed skull fractures and fourteen laceration wounds. Eight days later, Salazar died.

Three months later, in June 1978, Hovey was arrested in connection with the kidnapping of another young girl, Amy Guard, in Albany, California. In December of that year, while in custody for the Guard kidnapping, Hovey was arrested for the Salazar kidnapping and murder. Hovey was charged with kidnapping and with first degree murder with two "special circumstances": murder during a lewd and lascivious act on a child, which was dismissed during trial, and murder during the course of a kidnapping.

Under California law applicable at the time of Hovey's

---

[1]The following facts are derived from the last state opinion of record, *People v. Hovey*, 44 Cal. 3d 543 (1988), and evidence admitted during the course of the district court's evidentiary hearing.

trial, kidnapping was not a felony that could give rise to a first degree felony murder conviction; it could only support a finding of second degree murder. *See* Cal. Penal Code § 189 (1988); *People v. Ford*, 65 Cal. 2d 41, 57 (1966), *overruled on other grounds by People v. Satchell* 6 Cal. 3d 28 (1971); *see also* 1 B. E. Witkin & Norman L. Epstein, California Criminal Law § 470, at 220-21 (2d ed. Supp. 1999) (discussing 1990 addition of kidnapping to California Penal Code section 189). Furthermore, under the provisions of California law applicable to Hovey's case, the first degree murder in the course of a kidnapping special circumstance with which Hovey was charged required the jury to find a willful, deliberate, and premeditated murder. *See* Cal. Penal Code § 190.2(c)(3) (1977). Thus, a finding of premeditation was critical to Hovey's eligibility for the death penalty.

After his arrest, but before trial on the Salazar kidnapping and murder, Hovey was convicted of the Guard kidnapping. In return for the exclusion of the Guard conviction from the Salazar murder trial, Hovey stipulated that he had taken Salazar against her will and had committed the acts that caused her death. The stipulation thus conclusively established Hovey's identity as Salazar's killer. As a result, the central issue at the guilt-phase trial became whether the killing was sufficiently deliberate and premeditated to support a death-eligible first-degree murder conviction.

Two attorneys from the Alameda County Public Defender's Office were appointed to represent Hovey. Early in the trial, the trial judge sua sponte convened an evidentiary hearing to address the judge's concerns regarding the competency of Hovey's primary attorney. Hovey was neither informed about the two-day hearing nor invited to participate. At the conclusion of the hearing, the court found counsel competent to represent Hovey.

During the guilt phase, eyewitnesses testified that on the day of the kidnapping they saw a man struggling with and

beating a young child with an object in a light blue car near the place where Salazar was found. Two city employees testified that on the day of the kidnapping, while they were driving a City of Hayward marked car, they saw a light blue car that had been parked by the side of a road suddenly speed away. When they approached the place where the car had been parked, they discovered a grievously injured child lying on the ground.

The prosecution argued that Hovey had a knife in his car when he kidnapped Salazar and used the knife to kill her. No knife was ever found. Two prosecution medical experts, Drs. Chow and Loquvam, testified that Salazar's wounds could have been caused by a knife. In addition, two jailhouse informants, Thomas Hughes and Donald Lee, each recounted that while sharing a cell with Hovey, Hovey had said that he brought a knife with him when he kidnapped Salazar and killed her with a knife. Hughes testified at trial, but Lee did not; instead, his testimony from Hovey's pretrial hearing was read to the jury.

The prosecution's theory of motive was that Hovey had abducted Salazar to sexually molest her and killed her to prevent her from identifying him as her assailant. Hughes and Lee each testified that Hovey told him that he had killed Salazar because he was afraid she would identify him after she kept trying to remove the blindfold, according to Lee, or the hood-bag, according to Hughes, that Hovey had placed over Salazar's head to keep her from seeing him. No blindfold or hood-bag was reported by the individuals who found Salazar.

The defense theory was that Hovey did not intend to kill Salazar but had struck her in a panic. Hovey did not testify. The defense attempted to discredit the knife testimony by portraying Hughes and Lee as sophisticated individuals who had fabricated their testimony to secure protection in jail and lenient treatment for the charges pending against them. The defense argued that Hovey had not brought a weapon with

him when he kidnapped Salazar, but instead panicked and used a blunt instrument that he found in the car, possibly a shock absorber. A defense medical expert testified that Salazar's wounds were caused not by a knife, but rather by a blunt instrument. To support lack of premeditation, the defense argued that Hovey had pushed Salazar out of the car directly in front of the two City of Hayward employees to attract their attention so that she could get medical help, thus showing that he had not intended to kill her.

The jury found Hovey guilty of first degree murder with the special circumstance of murder during a kidnapping, and guilty of kidnapping with infliction of great bodily injury. The jury also found that he had used a deadly weapon, a stabbing instrument, during the commission of the crime.

In the penalty phase, Hovey's key witness was Dr. Satten, a psychiatrist who testified that Hovey suffered from schizophrenia, and that this mental illness caused Hovey to lose control and kill Salazar. The jury found that the aggravating circumstances of the crime outweighed the mitigating circumstances and returned a death verdict. Hovey's conviction and sentence of death were affirmed on direct appeal. *People v. Hovey*, 44 Cal. 3d 543 (1988). After the state courts rejected Hovey's petitions for habeas relief, Hovey filed a federal habeas petition in 1991. In seven orders issued between 1996 and 2002, the district court rejected all of Hovey's claims and ultimately denied his habeas petition. This appeal timely followed.

## II.   Jurisdiction and Standard of Review

The district court had jurisdiction over this petition for habeas corpus pursuant to 28 U.S.C. § 2254. We have jurisdiction over final judgments of the district court pursuant to 28 U.S.C. § 2253(a).

This is a pre-AEDPA case. *See* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132,

110 Stat. 1214. Therefore, we review the district court's decision to grant or deny a 28 U.S.C. § 2254 habeas petition de novo. *See Alcala v. Woodford*, 334 F.3d 862, 868 (9th Cir. 2003). Legal questions and mixed questions of law and fact are reviewed de novo. *See Swan v. Peterson*, 6 F.3d 1373, 1379 (9th Cir. 1993). Factual findings made by the district court are reviewed under the "significantly deferential" clearly erroneous standard, in which we accept the district court's findings of fact absent a "definite and firm conviction that a mistake has been committed." *Silva v. Woodford*, 279 F.3d 825, 835 (9th Cir. 2002) (as amended) (internal quotation marks omitted). "Although less deference to state court factual findings is required under the pre-AEDPA law which governs this case, such factual findings are nonetheless entitled to a presumption of correctness unless they are not fairly supported by the record." *Id.* (internal quotation marks omitted); *see also* 28 U.S.C. § 2254(d)(8) (1996). We grant habeas relief only if the alleged errors "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks omitted).

## III.   Guilt Phase

Hovey asserts five guilt-phase and two penalty-phase claims of error. We discuss his claims, and the relevant facts, in turn.

### A.   Mid-Trial Attorney Competency Hearing

Hovey claims that his rights to unconflicted counsel, to be present, and to confront witnesses against him each were violated at a mid-trial hearing on his attorney's competence. We agree with the district court that the hearing was not a critical stage at which Hovey's right to unconflicted counsel attached and that Hovey had no right to confront witnesses at the hearing. We also conclude that even if Hovey had a due process

right to be present at the hearing, his exclusion from the hearing was harmless error.

## 1.   Factual Background

During a mid-trial colloquy outside the jury's presence about the admissibility of a prosecution witness's prior testimony, defense counsel stated that he was not prepared to make objections at that time. Concerned that counsel might be rendering ineffective assistance, the trial court called counsel for both sides into chambers to discuss defense counsel's conduct.

Over the course of two days, the trial court held four in camera sessions in which the court queried defense counsel, his co-counsel, and his superiors in the Alameda County Public Defender's Office about counsel's competence. The prosecution was excluded from most of these sessions, Hovey from all of them. The court initially appeared concerned only that counsel was not being honest about his lack of preparation and that he was attempting to build error into the record. The court soon broadened its inquiry, however, to examine counsel's overall competence, including whether there was anything in his personal life that might be interfering with his ability to represent Hovey properly. At counsel's request, the court instructed those present not to discuss the in-chambers proceedings with anyone. The court subsequently clarified that its ruling permitted defense counsel to discuss the proceedings with Hovey.

Throughout the hearing, counsel deflected the court's inquiries, asserting attorney-client privilege and refusing to answer the court's questions. Counsel objected to the court's jurisdiction to hold the hearing and asked for counsel to represent him, and he made inconsistent statements about whom he was representing at the hearing. The court twice cited counsel for contempt, accused him of being "dishonest" during the hearing, and found his conduct "shocking." At the conclusion

of the hearing, however, the court found counsel competent to represent Hovey and absolved him of contempt. Nothing in the record suggests that Hovey expressed dissatisfaction with counsel at any point during the remainder of the trial.

## 2. Discussion

We reject Hovey's claim that his Sixth Amendment right to counsel was violated because he was represented only by conflicted counsel, and thus effectively unrepresented, during the competency hearing. The right to counsel, and the "correlative right" to unconflicted counsel, *Wood v. Georgia*, 450 U.S. 261, 271 (1981), attach at all critical stages of a criminal prosecution. *See, e.g.*, *United States v. Wade*, 388 U.S. 218, 224-25 (1967). A critical stage is any "stage of a criminal proceeding where substantial rights of a criminal accused may be affected." *Mempa v. Rhay*, 389 U.S. 128, 134 (1967); *see also Bell v. Cone*, 535 U.S. 685, 696 (2002) (defining a critical stage as "a step of a criminal proceeding, such as arraignment, that [holds] significant consequences for the accused").

On the basis of Supreme Court precedent, principally *Mempa* and *United States v. Ash*, 413 U.S. 300, 309, 313 (1973), we have distilled a three-factor test for determining what constitutes a critical stage. We consider whether: (1) "failure to pursue strategies or remedies results in a loss of significant rights," (2) "skilled counsel would be useful in helping the accused understand the legal confrontation," and (3) "the proceeding tests the merits of the accused's case." *Menefield v. Borg*, 881 F.2d 696, 698-99 (9th Cir. 1989). The presence of any one of these factors may be sufficient to render a stage of the proceedings "critical." *Cf. Ash*, 413 U.S. at 313 (noting that the relevant inquiry is "whether the accused require[s] aid in coping with legal problems *or* assistance in meeting his adversary") (emphasis added)).

Based on the specific facts of this case, we conclude that the attorney competency hearing did not involve a confronta-

tion at which an attorney would be needed to help Hovey cope with complex legal problems, nor, relatedly, were Hovey's interests subjected to a "critical confrontation[ ]," *Wade*, 388 U.S. at 227, or to a power "imbalance" in the face of the state's prosecuting authority, *Ash*, 413 U.S. at 309 (factor 2). Nor did the hearing test the merits of Hovey's case (factor 3).

The first factor presents a closer question. At a hearing on pre-trial matters held three weeks before the attorney competency hearing, Hovey asked to have another attorney appointed, "just somebody to kind of have a second opinion here, somebody outside of the public defender's office." The record does not illuminate Hovey's motivation for making this request, and the trial court denied the request without further inquiring into Hovey's concerns. To the extent Hovey felt counsel was inadequate, the competency hearing was arguably Hovey's best opportunity to have new counsel appointed, and the presence of unconflicted counsel might have achieved that result.

**[1]** But whatever benefits Hovey might have enjoyed from having unconflicted counsel present at the hearing, the absence of counsel did not permanently deprive him of any rights. During the hearing, the court repeatedly expressed a desire to know Hovey's feelings about his representation, asked defense counsel and other members of the Public Defender's Office to inquire into Hovey's opinion, and explicitly left open the possibility that Hovey could bring his concerns to the court's attention in the future. Nothing prevented Hovey from complaining about his attorney to the court at any point after the hearing and asking for appointment of new counsel, as he had shown himself capable of doing in the past. Thus, Hovey was not at risk of permanent deprivation of any significant rights during the hearing. Under the guiding Supreme Court cases and *Menefield*, the competency hearing, therefore, was not a critical stage. *Cf. LaGrand v. Lewis*, 883 F. Supp. 451, 464 (D. Ariz. 1995) (declining to

"define a hearing on a motion to change counsel as a critical stage"), *aff'd sub nom. LaGrand v. Stewart*, 133 F.3d 1253 (9th Cir. 1998).

Hovey relies upon two cases in which we found prejudicial error in the conduct of defense counsel competency hearings. Neither case aids him. Unlike in *United States v. Wadsworth*, 830 F.2d 1500 (9th Cir. 1987), the hearing here was initiated by the trial judge, did not result in Hovey losing the right to obtain new counsel, did not compromise the time he had to prepare for trial, and did not force Hovey to proceed to trial unrepresented. *Cf. id.* at 1508-10. *United States v. Adelzo-Gonzalez*, 268 F.3d 772 (9th Cir. 2001), did not address whether hearings prompted by the defendant's motions for appointment of new counsel were critical stages, but rather whether the trial court abused its discretion in denying the motions. *Id.* at 777.

We also reject Hovey's claim that he is entitled to habeas relief because his due process right to be present was violated when he was excluded from the competency hearing. A criminal defendant has a due process right to be present at every stage of trial where his absence might frustrate the fairness of the proceedings. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam). The defendant bears the burden of showing "how this hearing was unfair or that his presence at the hearing would conceivably have changed the result." *Siripongs v. Calderon*, 35 F.3d 1308, 1321-22 (9th Cir. 1994) (as amended).

We need not decide whether Hovey's right to be present was violated because, as we recently held in *Campbell v. Rice*, a violation of the right to be present is trial error, subject to harmless error review. 408 F.3d 1166, 1172 (9th Cir. 2005) (en banc), *cert. denied*, 126 S. Ct. 735 (2005). Even if Hovey had a right to be present at the competency hearing, his exclusion from the hearing was harmless.

**[2]** The hearing focused on the effectiveness of Hovey's counsel. At most, Hovey's presence at the hearing could have resulted in the trial judge appointing new counsel (although Hovey has presented no evidence suggesting he had anything useful to contribute at the mid-trial competency hearing). As we explain below, however, Hovey's counsel was not ineffective at the guilt phase in any respect reasonably likely to have affected the outcome of his trial. Accordingly, there is no reasonable probability that obtaining replacement counsel would have changed the outcome of the guilt-phase proceedings, and Hovey's exclusion from the competency hearing was not prejudicial. *See id.* (concluding that because petitioner suffered no adverse effect from counsel's conflict of interest, no prejudice resulted from petitioner's exclusion from a hearing in which the trial judge investigated the extent of the conflict of interest); *see also United States v. Wheat*, 813 F.2d 1399, 1404-05 (9th Cir. 1987) (as amended), *aff'd*, 486 U.S. 153 (1988).

As discussed below, we conclude that Hovey's counsel rendered ineffective assistance in the penalty phase and that it is reasonably probable that the outcome of the penalty phase would have been different had counsel been competent. Because we grant Hovey's habeas petition as to the penalty phase, we need not independently consider any penalty-phase prejudice caused by Hovey's exclusion from the hearing on his counsel's competence.

Finally, we reject Hovey's claim that his exclusion from the hearing violated his Sixth Amendment right to confront witnesses against him. To ensure a fair and accurate trial, the Confrontation Clause protects a defendant's ability to effectively cross-examine prosecution witnesses testifying against him. *See, e.g.*, *Maryland v. Craig*, 497 U.S. 836, 845-46 (1990); *Coy v. Iowa*, 487 U.S. 1012, 1019-20 (1988). The confrontation right attaches when an individual testifies against a defendant in an adversary proceeding before the trier of fact, *see Craig*, 497 U.S. at 845, not merely when an individual's testimony is potentially adverse to a defendant.

Hovey had no confrontation right because neither his counsel nor any other witness in the hearing testified "against" Hovey. *See, e.g.*, *Miller v. Stagner*, 757 F.2d 988, 996 (9th Cir.) ("Appellants were not denied their Sixth Amendment right 'to be confronted with the witnesses against [them]' because jurors are not witnesses against the defendant." (alteration in original)), *as amended*, 768 F.2d 1090 (9th Cir. 1985). Moreover, the hearing addressed counsel's competence, which was not an issue before the jury, rather than any evidence against Hovey.

## B. Ineffective Assistance of Counsel in the Guilt Phase

We reject Hovey's claim that he suffered ineffective assistance of counsel in the guilt phase of trial based on: (1) counsel's overall trial strategy and decision against moving to strike the lewd and lascivious charge until very late in trial, and his eventual decision to move to strike the charge; (2) counsel's closing argument; (3) counsel's failure to adequately investigate government informants Hughes and Lee, resulting either from counsel's conflict of interest due to the Public Defender's Office's prior representation of the two, or from counsel's deficient performance; and (4) counsel's failure to conduct an adequate voir dire. Hovey additionally claims the district court abused its discretion in excluding expert testimony from the evidentiary hearing on this claim.

To prove ineffective assistance of counsel, Hovey must first show that counsel's performance was deficient, measured under a standard of "reasonably effective assistance." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Second, Hovey must establish prejudice by showing that "there is a reasonable probability," defined as "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Although counsel's performance was deficient in some respects, Hovey fails to show prejudice.

## 1.  Trial Strategy and the Special Circumstance Charge

**[3]** Because his decision was motivated by sound trial strategy, counsel was not deficient in choosing not to challenge the lewd and lascivious conduct special circumstance charge at the outset of trial. Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted). Counsel believed that because of the circumstances of the crime, the jury almost certainly would return a first degree rather than second degree murder verdict. Accordingly, counsel aimed for a first degree conviction on felony murder grounds, rather than on premeditation grounds. Although kidnapping would not support a first degree felony murder conviction, the felony of committing a lewd and lascivious act on a child would. *See* Cal. Penal Code § 189 (1988). This strategy was the only way that the jury could convict Hovey of first degree murder without exposing him to the possibility of a death sentence, and was not deficient performance. Hovey faced substantial evidence pointing toward premeditation, including the informants' testimony about the knife, as well as medical testimony indicating that Salazar's wounds could have been caused by a knife. Counsel's strategy to avoid the death penalty may have carried some risk, as the district court noted, but it was a reasonable one in light of the circumstances. *See Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995) (as amended) ("The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists.").

Moreover, even if we were to find counsel's performance deficient, there was no prejudice. Hovey argues that the jurors were further inclined to return a verdict against him because they were read the charge of lewd and lascivious conduct at the beginning of trial; they were told by the prosecutor in his

opening statement that he would prove molestation; and they heard testimony of the two government informants suggesting that Hovey had molested Salazar. But even if counsel had moved to strike the special circumstance at the beginning of the trial, most of the evidence would have been admitted anyway. The trial judge herself stated that she would have allowed the prosecution to introduce evidence showing attempted molestation as relevant to motive. The only difference a successful motion to strike the charge, or a distinct overall trial strategy, for that matter, would have made is that the jury would not have been read the lewd and lascivious conduct charge at the outset of trial. This different circumstance is insignificant in light of the entirety of the evidence presented against Hovey throughout the guilt phase. There is not a reasonable probability that, but for counsel's decision against moving to strike the charge, the outcome of the proceeding would have been different.

[4] As for counsel's decision to move to strike the lewd and lascivious conduct charge at the close of the prosecution's case-in-chief, Hovey again fails to establish prejudice. Even if counsel was deficient in making a decision that "may have been motivated in part by his own interests" to avoid charges of incompetence, as the district court found, a question we do not decide here, counsel's decision to strike the charge did not prejudice Hovey because the course of the trial would have proceeded in the same way had counsel chosen to make the motion at the outset of trial, or not at all. Therefore, we find that there is not a reasonable probability that the result of the proceeding would have been different.

[5] We further hold that counsel's overall trial strategy did not constitute ineffective assistance of counsel. Hovey argues that counsel's choice to settle for a goal of felony murder rather than aiming for a second degree verdict derived from incompetence. Hovey contends that because counsel failed to investigate the government informants adequately, whether owing to a conflict of interest or to deficient performance,

counsel could not make a reasonable judgment as to whether the prosecution's case for premeditation, which rested largely on the informants' testimony, was sufficiently strong to justify a strategy based on the impossibility of a second degree verdict. The evidence shows, however, that counsel's tactical decision was not affected by the strength of the government's case. Counsel explained that he chose to settle for a first degree murder conviction that would avoid death-eligibility because he believed an attempt to convince the jury of second degree murder would be "an absurd request." Counsel based this assessment on the egregiousness of the crime. He believed that because the victim was an abducted child who was brutally attacked, facts admitted by Hovey, the jury would lean heavily toward first degree murder, regardless of whatever evidence there might be to support a second degree conviction. There is no evidence to suggest that counsel formulated this theory of defense in response to the informants' role in the prosecution's case. Thus, counsel's failure to investigate the informants does not bear on his trial strategy, and his choice was strategic, not incompetent. *See Anderson v. Calderon*, 232 F.3d 1053, 1087-90 (9th Cir. 2000) (holding that counsel was not deficient in seeking a conviction for first degree murder, rather than felony murder, in order to avoid exposing his client to the death penalty, and concluding that counsel "made a reasonable assessment that the jury would be very unlikely to let Anderson off of the hook completely"); *overruled on other grounds by Osband v. Woodford*, 290 F.3d 1036 (9th Cir. 2002).

## 2.  Closing Argument

We also reject Hovey's claim that counsel's closing argument constituted ineffective assistance. Hovey contends that counsel conceded guilt of first degree murder when, referring to a chart that compared the requirements for first degree premeditated murder with those for second degree murder, he stated:

I submit to you that it's within the realm that there could be findings . . . of willful, deliberate and premeditated . . . yet . . . there may be some reasonable doubt.

I think under the law as it's presented by [the prosecutor] in this case, there are theories that could support a second degree murder. In fact, absent willful, deliberate[ ] premeditation, it is second degree murder. I do think also it could be first degree murder and I recognize it also could be special circumstance. I believe that that is within your province to find as you see because you're the judges to pass on the facts and you will.

**[6]** Counsel did not concede premeditation with these words. Although he stated that "there could be findings . . . of willful, deliberate and premeditated," he made this point in the context of weighing the jury's options. Moreover, the evidence presented at the evidentiary hearing shows that counsel's statement was a reasonable strategic determination. In response to questioning about the closing argument, counsel explained, "I knew that if I tried to sell a second degree that I would not sell it and I would lose credibility." When asked to explain the rationale for his statement to the jury, counsel responded, "It's one of credibility." Rather than a concession of guilt, counsel engaged in rhetoric to preserve his credibility in the eyes of the jurors. Because counsel's statement was driven by strategy, and *Strickland* requires deference to informed strategic choices, *see* 466 U.S. at 689, we do not find deficient performance in the closing argument.

Our conclusion that counsel's closing argument did not amount to deficient representation is supported by recent decisions from the Supreme Court stressing the deference owed to the choices made by defense counsel in crafting summations. In *Yarborough v. Gentry*, 540 U.S. 1, 7-10 (2003) (per curiam), for example, the Court counseled that defense attor-

neys often must make strategic decisions as to what arguments to include in closing arguments and may choose to acknowledge the "shortcomings" of their client's case in order to build credibility with the jury. In *Bell*, the Supreme Court approved of a strategic decision by counsel to waive closing argument altogether, to prevent the prosecutor from having an opportunity at a rebuttal closing. 535 U.S. at 701-02. And in *Florida v. Nixon*, 543 U.S. 175, 192 (2004), the Court stated that when facing the distinct possibility of a penalty phase, it can be reasonable for defense counsel to concede guilt in a guilt-phase closing argument in an attempt to "impress the jury with his candor," for purposes of building on that impression during the penalty phase.

Even if we were to find counsel's performance deficient, moreover, once again Hovey fails to show how he was prejudiced. Hovey argues for presumed prejudice, because the closing argument fits within the limited set of circumstances that are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Thomas*, 417 F.3d 1053, 1056-57 (9th Cir. 2005) (internal quotation marks omitted), *cert. denied*, 126 S. Ct. 1095 (2006). However, we will presume prejudice only where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984); *see also Nixon*, 543 U.S. at 189 (noting that *Cronic* is "reserved for situations in which counsel has entirely failed to function as the client's advocate"). Where counsel's failure to oppose the prosecution occurs only in isolated points during the trial, we will not presume prejudice. *See Bell*, 535 U.S. at 697.

Counsel's closing statements, even if properly characterized as concessions, constituted only a few isolated sentences within the entire trial. At no point did counsel recommend that the jury find Hovey guilty of first degree murder. As a whole, counsel's closing argument attempted to expose the deficiencies in the prosecution's case. Counsel correctly iden-

tified the testimony of Hughes and Lee as the only direct evidence of premeditation and vigorously attacked their credibility, characterizing their account of events as "unreliable" and "suspect." Counsel also argued that the medical testimony "doesn't support an intent to kill." Finally, counsel's closing argument reminded the jury of the government's burden by arguing that reasonable doubt existed. In contrast, in cases such as *United States v. Swanson* where prejudice was presumed, the defense attorney stated several times in closing that he would not "insult [the jurors'] intelligence" by attempting to argue that there was a reasonable doubt as to whether his client had committed the robbery for which he was being tried. 943 F.2d 1070, 1076-77 (9th Cir. 1991). There we explained,

> By arguing that no reasonable doubt existed regarding the only factual issues in dispute, [counsel] shouldered part of the Government's burden of persuasion. We cannot envision a situation more damaging to an accused than to have his own attorney tell the jury that there is no reasonable doubt that his client was the person who committed the conduct that constituted the crime charged in the indictment.

*Id.* at 1075. Hovey's claim mirrors that in *Thomas*, where counsel conceded his client's guilt to protect his own credibility and avoid conviction on other charges. In holding that counsel had not "fail[ed] to subject the prosecution's case to meaningful adversarial testing," *Thomas*, 417 F.3d at 1057-58, we emphasized that *Cronic* requires wholesale failure by counsel to defend the client; isolated statements, especially those made for strategic reasons, do not qualify. *See id.* Accordingly, the *Strickland* standard, not that of *Cronic*, applies.

Under *Strickland*, Hovey fails to show prejudice. Hovey grounds his claim of prejudice on the prosecutor's reiteration of his counsel's statements during his own closing. This mere

mention of counsel's comments, however, does not establish any likelihood that the jury considered them, especially in light of the court's instruction to the jury that "statements made by the attorneys during the trial are not evidence," and fails to show any probability that had counsel not made those comments, the outcome of the trial would have been any different.

### 3. Investigation and Impeachment of the Informants

Hovey argues that counsel's failure to adequately investigate and impeach the government informants was ineffective assistance of counsel. He bases this claim on two alternative theories. First, he argues that because of the Public Defender's Office's prior representation of both Hughes and Lee, and co-counsel's prior representation of Hughes, there was an actual conflict of interest that adversely affected counsel's handling of his trial. *See Cuyler v. Sullivan*, 446 U.S. 335, 348-50 (1980). Second, he contends that even setting aside the conflict, counsel's failure to adequately investigate the informants was deficient and caused prejudice. We disagree.

The Sixth Amendment right to counsel encompasses a right to representation "free from conflicts of interest." *Wood*, 450 U.S. at 271. To establish ineffective assistance of counsel based on a conflict of interest, Hovey must show an actual conflict of interest that adversely affected counsel's performance. *Cuyler*, 446 U.S. at 348-50. A showing of prejudice from any such adverse effect is not required. *See United States v. Hearst*, 638 F.2d 1190, 1194 (9th Cir. 1980).

An "actual conflict" results when counsel "actively represented conflicting interests." *Strickland*, 466 U.S. at 692 (internal quotation marks omitted). An actual conflict need not be a direct conflict, and it need not be established separately from adverse effect. *See Mickens v. Taylor*, 535 U.S. 162, 172 n.5 (2002). Instead, an actual conflict "is a conflict of interest that adversely affects counsel's performance." *Id.*

Successive representation is sufficient to establish a conflict, *see Belmontes v. Brown*, 414 F.3d 1094, 1118 (9th Cir. 2005) (holding that "conflicts of constitutional magnitude can arise from cases of successive representation"), *cert. granted sub nom. Ornaski v. Belmontes*, 126 S. Ct. 1909 (U.S. May 1, 2006) (No. 05-493), as is imputed rather than direct conflict, *see United States v. Rodrigues*, 347 F.3d 818, 824 (9th Cir. 2003) (noting the Ninth Circuit's refusal "to draw a distinction between direct and imputed conflicts for purposes of the *Sullivan* analysis"). Because actual conflict is defined by its impact, "[g]enerally, it is more difficult to show an actual conflict resulting from successive rather than simultaneous representation." *Mannhalt v. Reed*, 847 F.2d 576, 580 (9th Cir. 1988). "In successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties." *Id.*

To show an actual conflict resulting in an adverse effect, Hovey must demonstrate "that some plausible alternative defense strategy or tactic might have been pursued but was not and that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *United States v. Wells*, 394 F.3d 725, 733 (9th Cir. 2005) (internal quotation marks omitted); *see also United States v. Schwayder*, 312 F.3d 1109, 1118 (9th Cir. 2002) (alternatively describing the standard as requiring "that counsel was influenced in his basic strategic decisions" by the conflict (internal quotation marks omitted)). Here, there was no defense strategy or tactic that counsel abandoned as a result of the conflict.

Hovey argues that counsel should have followed up on the informants' histories of mental health problems and drug and alcohol dependency. Counsel stated that he faced an "impediment" due to the prior representation of the informants by the Public Defender's Office and by co-counsel and that there was a certain amount of investigation that he did not under-

take because he felt constrained by the conflict. The district court, however, did not take counsel's testimony at face value, but instead made a factual finding that counsel's failure to fully investigate the informants was not motivated by any conflict of interest, but rather by counsel's own incompetence. Based on a review of the evidence, that finding was not clearly erroneous. Counsel's no-holds-barred impeachment of the informants, adopting a trial strategy of portraying the informants as untrustworthy individuals who fabricated testimony for their own benefit, supports the district court's conclusion that counsel's handling of the informants was not affected by the indirect conflict.

Because the district court properly found that any failure to investigate the evidence supporting an alternative defense theory stemmed from neglect, not from divided loyalties, we focus our inquiry on the traditional inquiry into deficiency and prejudice that is applicable to such ineffective assistance claims. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. We evaluate the scope of the duty to investigate in light of the context of the trial. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

[7] Here, despite counsel's awareness that Hughes and Lee were the key to the prosecution's case, he failed to take any reasonable steps to follow up on information that was in his files. Included in counsel's files on Hughes were several items that "reasonably competent counsel" would have investigated. First, counsel had a memorandum written by his investigator summarizing the report that was completed during Hughes's ninety-day diagnostic evaluation at a state facility in Vacaville. Counsel acknowledged that, although he had no independent recollection of the document, it had probably been sent to him while he was representing Hovey, but that he

failed to follow up on it. Second, the investigator submitted a second memorandum recommending that counsel obtain records concerning Lee's incarceration in a mental facility in Oklahoma and indicating that Lee was "described as being mildly retarded." Counsel testified that he did not recall seeing the memorandum and admitted that he never obtained the records. These decisions not to investigate the informants fell below an objective standard of reasonableness.

[8] However, Hovey was not prejudiced by this failure. The district court correctly found that the information that Hovey thought counsel should have investigated, such as the records of Lee's treatment for mental illness, likely would have been unavailable even if counsel had attempted to obtain it, and the information regarding the informants' mental health and histories of drug and alcohol abuse would have conflicted with counsel's strategy of portraying them as "crafty snitches." Hovey responds that had counsel investigated any of this information, he might have realized that a more effective strategy would have been to portray the informants as unreliable individuals with histories of psychological problems that skewed their memory and perception of Hovey's story. We disagree. Such an impeachment strategy would have been futile, given that Hughes and Lee testified to admissions by Hovey that were identical in most material respects. Any suggestion that the same story being recounted by two different individuals was the product of mental problems or drug use would have defied logic. Instead, counsel adopted the only impeachment strategy that would have been effective—that Hughes and Lee were liars who concocted their testimony against Hovey whether jointly or after coaching by the police to curry favor with the government. Accordingly, there is not a "reasonable probability" that the outcome of the trial would have been different but for counsel's deficiency, as required by *Strickland*.

### 4. Voir Dire

[9] We reject Hovey's claim that counsel's voir dire was so perfunctory that counsel failed to protect Hovey's right to an

impartial jury. Counsel generally limited his voir dire to three questions that covered whether the juror could "follow the law," "be fair to both sides," and "wait until all the evidence is in" before forming an opinion on the verdict. Hovey argues that counsel should have questioned potential jurors on both the widespread pretrial publicity and Hovey's decision not to testify. We disagree. Although counsel's decision not to question prospective jurors more extensively may seem a questionable decision in hindsight, it was guided by a reasonable strategy and was not deficient performance.

The conduct of voir dire "will in most instances involve the exercise of a judgment which should be left to competent defense counsel." *Gustave v. United States*, 627 F.2d 901, 906 (9th Cir. 1980). We are cognizant of the "wide latitude counsel must have in making tactical decisions," and are mindful that "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Counsel testified to his belief that in defending a capital case, "the least voir dire is the best tactic," explaining that he preferred to rely on "nonverbal communication" to make determinations about potential jurors because that avoids exposing potentially favorable jurors to prosecutorial challenges. When asked why he did not inquire into potential jurors' reaction to the pretrial publicity, counsel stated that because four years had passed since the publicity, he was hoping the jurors had forgotten about it, and he did not "want to go back and wake anybody up." He also explained that he did not inquire about jurors' attitudes toward a defendant's failure to testify because he was concerned that Hovey might change his decision. He also felt that he could address any juror concerns through jury instructions later in the trial. As in *Gustave*, counsel's "decision whether to request certain voir dire questions was a strategic decision of the attorney and his failure to do so . . . is not ineffective representation." 627 F.2d at 906; *see also Wil-*

*son v. Henry*, 185 F.3d 986, 991 (9th Cir. 1999) (holding that there was no ineffective assistance of counsel where counsel relied on jurors' statements that they would be fair and follow the law without asking about their views on criminal history).

### 5.   Exclusion of Experts

The district court did not abuse its discretion in excluding the testimony of four expert witnesses during the evidentiary hearing on Hovey's ineffective assistance of counsel claims. *See United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir. 1997) (en banc). "A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts." *Id.* Reversal is appropriate "where we have a definite and firm conviction that the district court committed a clear error of judgment. However, a trial court has broad discretion in assessing the relevance and reliability of expert testimony." *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir. 2002) (citation and internal quotation marks omitted).

Expert testimony, while not necessary, is sometimes relied upon in determining claims of ineffective assistance of counsel. *See, e.g.*, *Karis v. Calderon*, 283 F.3d 1117, 1133 n.9 (9th Cir. 2002). A court reviewing an ineffective assistance claim should consider counsel's performance in the context of then " 'prevailing professional norms,' which include[ ] a context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.' " *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (quoting *Strickland*, 466 U.S. at 688-89).

Nonetheless, this standard does not "require[ ] that expert testimony of outside attorneys be used to determine the appropriate standard of care." *LaGrand*, 133 F.3d at 1271 n.8; *see also* Fed. R. Evid. 702 ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness quali-

fied as an expert . . . *may* testify thereto in the form of an opinion or otherwise . . . ." (emphasis added)). The Supreme Court has cautioned against evaluating ineffective assistance claims based on generalized rules, noting that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89. The district court's rationale for excluding the experts echoed this statement. The court concluded that "it would be inappropriate for an expert to purport to articulate a general standard of care at the level of fact-specific detail that would be required to accommodate all of the unique facts and circumstances [counsel] encountered while formulating his strategy in this case."

**[10]** The district court may have underestimated the potential value of the experts' testimony. Each proffered expert had reviewed the state court opinions, the transcripts of the trial, and the briefs. Thus their professional opinions were based not on their expertise in general standards of representation, but instead on thorough and detailed research of Hovey's particular situation. But in determining the admissibility of expert testimony, a district court "must consider the [testimony's] probativeness," *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993), and in making that determination, a district judge's own ability to assess the issues is critical. For example, in *Bonin v. Calderon*, in holding that the district court did not abuse its discretion in refusing to allow an expert on juror psychology to testify regarding Bonin's claim that he was prejudiced by his attorney's conduct, we noted, "The district judge is himself qualified to assess the likely responses of a jury to certain evidence and is also qualified to understand the legal analysis required by *Strickland*." 59 F.3d 815, 838 (9th Cir. 1995). Here, the district court was qualified to assess the factual and legal issues involved in Hovey's *Strickland* claim. While the experts' testimony may have provided additional perspective, given the "broad discretion"

accorded a trial court in determining the relevance of expert testimony, *Finley*, 301 F.3d at 1007, exclusion of their testimony was not an abuse of discretion.

We also reject Hovey's contention that the district court effectively treated Hovey's defense counsel and co-counsel as experts and, in so doing, erred by failing to allow Hovey to rebut their opinions. Both attorneys, however, were called as percipient witnesses who were questioned only about their strategic choices throughout the trial. The district court's ruling precluding expert testimony, therefore, was not error.

## C.   *Griffin* **Violations**

The district court correctly rejected Hovey's claim that the prosecutor violated *Griffin v. California*, 380 U.S. 609, 615 (1965), when he made two comments in closing argument that touched on Hovey's decision not to testify at his trial. We agree with the district court that the prosecutor's statements violate the rule of *Griffin*, but that they were harmless.

In the first statement Hovey complains of, which occurred at the outset of the closing argument, the prosecutor remarked, "Well, [Hovey] has admitted in effect the kidnapping and he has admitted in effect the killing, but he's never said anything to you about why, why he did these things." Later, in summarizing the evidence about the instrument that killed Salazar, the prosecutor stated:

> Now, you weigh the testimony of those witnesses, you decide who is credible and who isn't credible and you make a decision as to what was used, whether or not he used a knife. He said he used a knife. He's never told you anything different. (Indicating the defendant) There's nothing different.

At the end of the prosecutor's closing, the defense asked the court to cite the prosecutor for misconduct in referring to the

defendant's silence before the jury. The trial judge denied the motion, commenting that she did not believe that "in the whole context" the prosecutor was commenting on Hovey's silence.

The Due Process Clause prohibits a prosecutor from commenting on a defendant's decision not to testify. *Griffin*, 380 U.S. at 615. While a direct comment about the defendant's failure to testify always violates *Griffin*, a prosecutor's indirect comment violates *Griffin* only "if it is manifestly intended to call attention to the defendant's failure to testify, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Lincoln v. Sunn*, 807 F.2d 805, 809 (9th Cir. 1987). Although the prosecutor's comments here did not refer directly to Hovey's decision not to testify, they were indirect comments impermissible under *Griffin*. By focusing on Hovey's failure to explain his actions or to contradict the informants' testimony, the prosecutor's indication that Hovey "never said anything . . . about why . . . he did these things" and that Hovey "never told [the jury] anything different" called attention to Hovey's decision against taking the stand in his own defense. The prosecutor's statement that "[t]here's nothing different" naturally and necessarily implicates Hovey's decision not to testify, as Hovey is the only person who could definitively answer the question of whether he used a knife. *See id.* at 810 ("Courts have distinguished between those cases in which the defendant is the sole witness who could possibly offer evidence on a particular issue, and those cases in which the information is available from other defense witnesses as well."); *see also Williams v. Lane*, 826 F.2d 654, 665 (7th Cir. 1987) ("Prosecutorial references to 'uncontradicted' testimony are more readily deemed indirect references to the defendant's failure to testify in cases where it is 'highly unlikely that at least a portion of the testimony could have been contradicted by anyone other than the defendant.' " (quoting *United States v. Buege*, 578 F.2d 187, 189 (7th Cir. 1978)).

**[11]** The *Griffin* error, however, was harmless. Reversal is warranted only " 'where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis for the conviction, and where there is evidence that could have supported acquittal.' " *Lincoln*, 807 F.2d at 809 (quoting *Anderson v. Nelson*, 390 U.S. 523, 524 (1968) (per curiam)). Here, the prosecutor's inappropriate comments were isolated statements, and they were minimal in comparison with the weight of the evidence presented against Hovey. There was considerable evidence weighing in favor of conviction, including testimony that Hovey's weapon could have been a knife, and suggestions that Hovey had a motive to kill Salazar.

The absence of a curative instruction does not change our conclusion. Although the trial court's failure to offer a curative instruction may "compound[ ]" the *Griffin* error, *see Beardslee v. Woodford*, 358 F.3d 560, 588 (9th Cir. 2004) (as amended), whether an instruction is given is not dispositive. "[W]hen the comments are limited in nature and could not have affected the verdict, we have declined to reverse even in the absence of curative instructions." *Id.* Moreover, the trial court instructed the jury that

> [i]n deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon the failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him, and no lack of testimony on the defendant's part will supply a failure of proof by the People so as to support a finding against him on any such essential element.

The court also instructed the jury that "statements made by the attorneys during the trial are not evidence." We presume that juries follow their instructions. *See Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Given the insignificance of the

comments in the course of the trial as a whole, and the weight of the evidence against Hovey, the *Griffin* error was harmless.

**Volume 2 of 2**

## D.   *Brady*/*Napue* Violations

**[12]** We also affirm the district court's denial of Hovey's claim that the prosecution failed to disclose critical impeachment evidence on the informants and to correct inaccurate or misleading portions of their testimony. Specifically, Hovey argues that the prosecution violated *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to disclose: (1) information indicating that Hughes received lenient treatment in exchange for his testimony against Hovey; (2) an audiotape of a prosecution interview of Lee in which he refused to provide evidence against Hovey unless he received leniency in exchange; (3) a letter written by a deputy district attorney to the California Department of Corrections requesting Lee's transfer out of San Quentin; and (4) a teletype sent to law enforcement by the prosecution's chief investigator stating that Tina Salazar "was not molested." In addition, Hovey contends that the prosecution violated *Napue v. Illinois*, 360 U.S. 264 (1959), by failing to correct certain false testimony by the informants, including statements that they had received no promises in exchange for their cooperation in the State's case against Hovey. Because, as a matter of law, these nondisclosures did not violate *Brady* or *Napue*, we affirm the district court.

### 1.   Background

Hovey's claim centers on two sets of facts about Hughes and one about Lee, each of whom testified that Hovey told him that he had killed Salazar with a knife and that he killed her to prevent her from identifying him. Hughes became Hovey's cellmate in October 1978, while Hughes was awaiting sentencing for an escape conviction in Alameda County. The district attorney (D.A.) had recommended a sentence of one year and a day. Hughes testified that he met Sergeant Hess, an officer investigating the Salazar murder, a few days after he became Hovey's cellmate, but that they did not discuss Hovey until the second time they spoke. In December 1978, Hughes gave Hess a tape-recorded statement recounting

Hovey's admissions about the killing of Tina Salazar. Hughes returned to court for sentencing the following month. After the public defender declared a conflict of interest, Hughes elected to represent himself. When deposed in these proceedings, Hughes explained that he chose to represent himself "mainly because [he] was confident that Mr. Hess . . . was going to somehow intervene and see that [he] got probation," even though Hess had hold Hughes "[t]hat he couldn't promise [him] anything, couldn't make [him] any promises; and, anyway, he couldn't do anything until after [his] testimony." Hughes was sentenced to three years' probation and was released to drug treatment.

At Hovey's trial, Hughes testified that he had already made the probation deal with the Alameda County D.A. before he ever spoke with Hess about Hovey and before he agreed to cooperate with Hess against Hovey and gave his tape-recorded statement. That testimony conflicts with Hughes's deposition testimony before the district court that even before giving the tape-recorded statement, he had asked Hess to ensure that he would receive only probation, and that when he was informed of the public defender's conflict of interest and consequent withdrawal, he chose to represent himself, confident that Hess would intervene on his behalf.

A month after sentencing, Hughes violated the terms of his probation by leaving his drug treatment program without permission. His probation was revoked, and a bench warrant was issued for his arrest. He was apprehended in early 1981. In his deposition for this habeas proceeding, Hughes testified that he sought help from Meloling, the prosecutor in Hovey's case, who responded that "he wouldn't help [Hughes] until after the testimony," if at all. When Hughes appeared in court in March 1981, he was released on his own recognizance, on the D.A.'s recommendation.

Hughes initially failed to appear for Hovey's trial, and a bench warrant subsequently issued. Hughes testified at

Hovey's trial in November 1981. When he returned to court in February 1982 for a hearing on the probation violation, according to Hughes, the D.A. called Meloling at Hughes's insistence. After they spoke, according to Hughes's deposition testimony, the D.A. asked that Hughes's case be dismissed "in the interest of justice." Probation was terminated and Hughes was freed on the Alameda County conviction.

In addition to the Alameda County charges, Hughes had been arrested and charged with two counts of burglary in San Francisco. Hughes testified in this habeas proceeding that while he was being held on those charges, he asked Meloling to call the San Francisco County D.A. on his behalf, but that Meloling responded that "he couldn't do anything or make any promises until after [he] testified in the Hovey case." After Hughes testified, Meloling said that he would make the call.

Passaglia, the San Francisco deputy D.A. handling Hughes's case, testified that he received a call from Meloling shortly before Hughes's scheduled trial date in October 1981 asking for a continuance so that he could testify in Hovey's case. Hughes also stated in his deposition for this habeas proceeding that Meloling was responsible for having Hughes's trial postponed until after he testified at Hovey's trial. Passaglia's superior, Benson, spoke with Meloling, who told Benson that after Hughes testified he would send a letter to the San Francisco D.A. requesting that he consider Hughes's testimony when offering a plea agreement to Hughes.

Rosenbaum, the public defender representing Hughes on the San Francisco charges in 1981, declared that he spoke with Alameda County D.A. Traback and Hughes regarding Hughes's testimony against Hovey. Traback wanted Hughes to testify in Hovey's trial, but Hughes demanded a promise of leniency in exchange. According to Rosenbaum, Traback said that he could make no promises, but said "off the record" that he would do whatever he could for Hughes.

Hughes testified in a deposition in this habeas proceeding that he met with Meloling the day before he testified in Hovey's trial, and that Meloling instructed him to say that there were no promises made in exchange for his testimony. According to Hughes, Meloling explicitly told Hughes that there were no promises. However, in his deposition Hughes also stated that Meloling said several times, "Don't worry. We'll take care of it." Hughes also characterized his discussion with Meloling as an "unspoken agreement" in which it was "insinu[ated] that something would be done" for him. Hughes's testimony at Hovey's trial, however, was somewhat different. During his trial testimony, Hughes stated that no promises had been made to him, but that after testifying against Hovey, he had "hopes of not going to prison" on the San Francisco burglary charges.

The San Francisco D.A.'s initial offer to Hughes was to plead guilty to one count of second degree burglary and a firearms enhancement for a sentence of three years in state prison. After Hughes testified against Hovey, Meloling communicated with the San Francisco D.A.'s office, which then revised its offer to Hughes. He received a suspended sentence, but the term of imprisonment offered as part of the deal was actually increased from three years to four years and eight months.

Meloling testified that he did not discuss any "consideration" for Hughes's testimony and that he never made "any promises" to Hughes. Meloling conceded, however, that he may have told Hughes that "things would be better for him" if he testified. He denied ever discussing a "deal" with the San Francisco D.A.'s Office, but he admitted that he "may have" spoken with someone in the D.A.'s Office about Hughes.

Donald Lee was sent to California state prison in Santa Rita in 1978 after he had escaped from a work furlough program while on parole. On October 10, 1978, he was assaulted in prison. That night, he spoke about the assault with Hess. The

following day, other inmates accused him of being an informant, and he asked to be placed in protective custody. As a result, he was placed in a cell with Hovey. A few days later, Lee was brought to see Hess. Lee testified that he and Hess only discussed the assault during this conversation and did not talk about Hovey. A few minutes after he was returned to his cell following the conversation, Lee was brought back out to talk with Hess. At this time, Hess stated that he did not know the identity of Lee's cellmate, but that Lee should not mention Hess's name to his cellmate. Lee was then returned to his cell.

At his October 19 arraignment, Lee pleaded guilty to escape charges and was sentenced to two years in prison. He testified that protective custody was part of the plea agreement. Lee had expected to be granted probation, and when that did not happen, Lee immediately called Hess to discuss Hovey. Later that day, Hess and Lee met, and their subsequent conversation was tape-recorded. During the taped interview, Lee repeatedly asked Hess for consideration in exchange for his cooperation against Hovey, and Hess repeatedly refused. Hess did offer, however, to place Lee in protective custody if Lee agreed to testify against Hovey.

After Lee testified at the preliminary hearing in Hovey's case, Deputy D.A. Parrilli sent a letter to the Law Enforcement Liaison at San Quentin and requested Lee's transfer to another facility. The request was granted, and Lee was transferred.

In his testimony at the preliminary hearing in Hovey's case, which was subsequently read to the jury at Hovey's trial, Lee stated that he knew that if he gave information to the guards and police, he would benefit. At Santa Rita, Lee was in protective custody because he had provided information to the authorities about an assault on him by other prisoners. He admitted that "snitching on Hovey" put him in a position to "get a little protection from the badge." Nonetheless, he testified that neither Hess nor any other law enforcement officer

had promised him anything in exchange for his testimony against Hovey.

## 2. Discussion

Under *Brady*, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To prevail on a *Brady* claim, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Banks v. Dretke*, 540 U.S. 668, 691 (2004) (internal quotation marks omitted). Prejudice occurs if the evidence is "material." *Silva v. Brown*, 416 F.3d 980, 985 (9th Cir. 2005). "Evidence is material if there is a reasonable probability that, had it been disclosed to the defense, the outcome of the trial would have been different." *Belmontes*, 414 F.3d at 1113. A "reasonable probability" of a different result exists "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.' " *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In evaluating materiality, however, the question is "not whether the defendant would more likely than not have received a different verdict with the evidence," and "is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions." *Strickler v. Greene*, 527 U.S. 263, 289-90 (1999) (internal quotation marks omitted). Instead, we focus on our confidence in the verdict. *Id.* In making this determination, we consider *Brady* violations cumulatively. *See Kyles*, 514 U.S. at 436-37.

*Napue* holds that the knowing use of false evidence by the state, or the failure to correct false evidence, violates due pro-

cess. 360 U.S. at 269. To prevail on a *Napue* claim, the petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecution knew or should have known that the testimony was actually false, and (3) . . . the false testimony was material." *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir. 2005) (en banc) (omission in original) (internal quotation marks omitted). For the purpose of *Napue* claims, materiality is determined by whether "there is 'any reasonable likelihood that the false testimony could have affected the judgment of the jury,' " in which case the conviction must be set aside. *Belmontes*, 414 F.3d at 1115 (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)). "Under this materiality standard, [t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Hayes*, 399 F.3d at 984 (alteration in original) (internal quotation marks omitted).

Evidence of a deal or promise of lenient treatment in exchange for a witness's testimony against a defendant may constitute evidence that must be disclosed under *Brady* and *Napue. See Giglio v. United States*, 405 U.S. 150, 154-55 (1972). The deal or promise need not be express; failure to disclose an agreement or guarantee of leniency "indicated without making a bald promise" also may violate *Brady*. *United States v. Butler*, 567 F.2d 885, 888 n.4 (9th Cir. 1978) (as amended). However, in the absence of a promise or deal, a witness's subjective belief that he might receive lenient treatment in exchange for testifying does not render perjurious his testimony that he received no promises that he would benefit from testifying. *See Williams v. Calderon*, 52 F.3d 1465, 1475 (9th Cir. 1995).

This appeal presents three categories of alleged prosecutorial misconduct: (i) suppression of evidence that was not favorable to Hovey, and thus cannot form the basis of a claim alleging a due process violation; (ii) suppression of evidence

that was favorable to Hovey, and thus must be analyzed for materiality; and (iii) failure to correct false testimony, which must also be analyzed for materiality.

### i. Suppression of Evidence That Was Not Favorable to Hovey

Three pieces of evidence that the government failed to produce, the tape of Lee's conversation with Hess, the letter from Parilli, and the teletype stating that Salazar was not molested, were not in fact favorable to Hovey, as none was impeaching or exculpatory. Suppression of this evidence therefore could not have violated due process under *Brady*.

The tape recording of the October 19, 1978 conversation between Lee and Hess does not suggest that there was any deal between Lee and the State. The conversation demonstrates only that Hess told Lee repeatedly that the State could *not* promise lenient treatment. Therefore, the tape could not have been used by the defense to impeach Lee's testimony from the preliminary hearing. That Lee ultimately chose to provide information, despite his insistence on the tape that he would not do so without some guarantee of leniency, is not sufficient to render the tape exculpatory or impeaching, even viewing the evidence in the light most favorable to Hovey, as there is no evidence that suggests that Lee made this decision because the prosecution eventually gave in to his demands. Especially because Lee stated at the preliminary hearing in Hovey's case that he eventually chose to cooperate with the State's case against Hovey to "relieve [his] mind" of the information Hovey told him, the tape does not overcome the inference that Lee chose to talk with Hess because he wanted to, not because he made a deal with the prosecution. Accordingly, the State's failure to disclose the tape could not have violated *Brady*.

Similarly, the State's failure to disclose the April 16, 1979 letter from Deputy D.A. Joanne Parrilli to Emmett Hurst of

the Department of Corrections could not have violated due process under *Brady*. In the letter, Parrilli explained that Lee had testified in a preliminary hearing in a murder case, that without his testimony the prosecution's case was "primarily circumstantial," and that Lee had been threatened by "known enemies." Parrilli closed the letter with a statement that if a transfer for Lee's safety was possible, her office would appreciate it. Two weeks later, Lee was transferred out of San Quentin. Parrilli testified in a deposition in this habeas proceeding that she did not recall offering any consideration to Lee. As the district court noted, neither the letter nor the fact of the transfer were potentially exculpatory or impeaching, as neither one demonstrates, nor raises an inference, that Lee's testimony was preceded by a deal. Making all reasonable inferences in favor of Hovey, the evidence shows at most that Lee was offered some protection *following* his testimony in the preliminary hearing. That Lee received favorable treatment after he testified does not have any bearing on the credibility of his testimony or on his motives in cooperating in the State's case against Hovey. Furthermore, the letter may only evidence a desire on the part of the State to ensure Lee's safety so that he would be available to testify at Hovey's trial. Therefore, the evidence is not exculpatory or impeaching.

The same is true of the teletype issued on April 10, 1978, before Hovey had been apprehended. The teletype described where Salazar was found, her condition when found, eyewitness accounts, and possible motives for the kidnapping. The teletype observed that Salazar "was fully clothed, had no bruises below the shoulders and was not molested," and it speculated that "[i]nterrupted sexual molestation is a possibility along with the possibility of a psychopath with no apparent motive." Hovey's habeas counsel became aware of the teletype only in 1994. Hovey argues that the teletype was exculpatory in that it supported a finding that there was no physical evidence of sexual activity. But no testimony that there *was* physical evidence of sexual activity was presented at trial, so an affirmative statement that there was no physical evidence

of sexual activity would not have affected Hovey's defense. Although the informants testified that Hovey had "play[ed] with" Salazar's body and indicated that he had intended to molest her, they did not suggest that there had been sexual activity that would produce physical evidence. Therefore, the teletype was not inconsistent with any testimony presented at trial, and could not have served to impeach the informants' testimony of molestation even if the State had provided the evidence to the defense. Accordingly, there can be no due process violation.

### ii.   Suppression of Evidence That Was Favorable to Hovey

The prosecution did, however, fail to disclose certain evidence regarding favorable treatment of Hughes that was potentially impeaching or exculpatory, and we therefore evaluate whether suppression of this favorable evidence violated due process. The district court found that the prosecution's failure to disclose that Hughes received lenient treatment—in the form of release on his own recognizance despite his probation violation—at the time between his sentencing on the Alameda County charges and his testimony against Hovey "did not render any of Hughes's testimony misleading, because he was not asked about the course of his probation at trial." We disagree with this characterization. We believe that this evidence could have been useful to Hovey, as the defense attempted to portray Hughes and Lee as sophisticated liars motivated by self-interest to fabricate evidence. Although the jury was aware of Hughes's hope of receiving leniency in exchange for testifying against Hovey, the fact that he *did* receive lenient treatment during the time between his plea and his testimony at Hovey's trial could have given the jury an additional reason to distrust Hughes's testimony. As a result of the State's nondisclosure of this evidence, the development of a more comprehensive theory of the informants' incentives in testifying was hindered. *See Banks*, 540 U.S. at 691 ("Corresponding to the second *Brady* component (evidence

suppressed by the State), a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence."). Accordingly, we analyze the suppression of this evidence for a due process violation under *Brady*.

In addition, as the district court did find, the evidence here, taken in the light most favorable to Hovey, reveals "an implicit agreement to provide some assistance to Hughes" on the San Francisco charges, which the prosecution did not disclose before trial. Hughes testified that he asked Meloling to call the San Francisco D.A. for him, a request to which Meloling acceded. Passaglia testified that Meloling did indeed call before Hughes's trial testimony and that Meloling agreed to send a letter on Hughes's behalf after he testified against Hovey. Meloling denied making an explicit deal with the San Francisco D.A.'s office, but he admitted that he "may have" spoken with the office on Hughes's behalf. Because existence of this implicit agreement was not disclosed by the State and was potentially impeaching, we analyze the suppression of this evidence as a *Brady* violation.

### iii.   Knowing Use of False Testimony by the State

Hovey claims that the prosecution violated *Napue* by failing to correct Hughes's testimony that he received "no promises" in exchange for his cooperation in the State's case against Hovey. Evaluating this claim, the district court concluded that "there is no factual dispute as to whether an explicit agreement for lenient treatment existed; all the witnesses involved testified that no explicit promises were made." But even though an explicit agreement for lenient treatment was not made, there were explicit agreements to *attempt* to secure lenient treatment for Hughes. Before Hughes testified in Hovey's trial, Meloling told an attorney in the San Francisco D.A.'s office that after Hughes testified he would write to the San Francisco D.A. requesting that it consider Hughes's testimony when negotiating his plea agree-

ment on the San Francisco charges, and he allegedly agreed to make a phone call on Hughes's behalf. Hughes's San Francisco counsel also testified that the Alameda County D.A. told him that he would do whatever he could for Hughes in exchange for his testimony. Furthermore, Meloling himself conceded that he might have told Hughes that "things could be better for him" if he testified. Although a specific deal was not promised to Hughes, the promise of a letter or a phone call, or a vow to use one's best efforts to secure a deal, are sufficient to constitute evidence that was potentially favorable to Hovey, as these promises belie Hughes's testimony that "no promises" had been made to him.

Hovey further argues that the State should have corrected Lee's false testimony during the preliminary hearing that Lee did not receive any promises in exchange for cooperating against Hovey, which was read to the jury at Hovey's trial. Hovey urges us to find that Lee's pretrial testimony that Lee and Hess did not discuss Hovey during their second meeting was false based on Lee's deposition testimony that Hess told Lee that if Lee testified against Hovey, Hess "would help [Lee] in anything [he] needed," and that Hess also gave Lee information about the crime, including the names of the victim and her mother, "what kind of vehicle [Hovey] was driving," and that Hovey had "raped her and killed her with a knife." Hovey further argues that the deposition suggests egregious prosecutorial misconduct in Hess's supplying Lee with information about Hovey before planting him in Hovey's cell. Standing alone, this portion of Lee's deposition would indicate that the prosecutor had a responsibility to correct Lee's false testimony at trial and, assuming materiality, his failure to do so violates *Napue*. However, Lee also stated in his deposition that he had never testified against Hovey and that he did not recall the preliminary hearing in 1978. Lee also denied ever telling Hess that Hovey had killed, kidnapped, or stabbed Salazar, and he maintained that he had in fact told Hess that Hovey had told him he was innocent. In addition, Lee testified that Hovey told him that he did not kill Salazar.

Even drawing all reasonable inferences in favor of Hovey, the inconsistencies in Lee's deposition render it completely unreliable. There is insufficient evidence in the record to support Hovey's claim that the State put on false evidence with regard to Lee's "no promises" testimony. Accordingly, we do not assess this issue as a potential due process violation under *Napue*.

**[13]** Hovey also contends that the State either relied on false testimony or failed to correct false testimony with respect to the timing of Hughes's probation deal with the Alameda County D.A. On summary judgment, we must draw all reasonable inferences in favor of Hovey. We therefore must consider the reasonable inference that Hughes's testimony at Hovey's trial that he had already made the deal with the D.A. when he talked with Hess was false in light of his later deposition testimony that he had asked Hess to ensure that he be sentenced to only probation. Although there is not *necessarily* a conflict between Hughes's testimony that he had made the deal with the D.A. before he spoke with Hess and his testimony that he asked Hess to help him, it is reasonable to infer one. The district court therefore erred in finding that the post-trial evidence bears out Hughes's trial testimony that he made the probation deal before he agreed to cooperate with the prosecution in Hovey's case. We must examine whether the State's failure to correct false testimony on this issue could have violated due process.

### iv.   Materiality Analysis

To summarize, we must address the materiality of the undisclosed evidence regarding the lenient treatment Hughes received, Hughes's misleading testimony that he received "no promises" from the prosecution in exchange for his cooperation in the State's case against Hovey, and Hughes's possibly false testimony as to the timing of his deal with the Alameda County D.A.

As to the nondisclosure of Hughes's lenient treatment, even taking all facts in the light most favorable to Hovey, the omission of this evidence was not material. Hughes's testimony was significant because he testified to Hovey's alleged motive to kill Salazar. Even if Hughes had been further impeached by the disclosure that he had not merely a hope of lenient treatment, but actual lenient treatment and promises of more such favors, the fact would remain that Lee testified to the same motive for the Salazar killing. We have held that there was no proof of constitutional error in the prosecution's handling of Lee's testimony. In determining materiality under *Brady*, we focus our inquiry on our confidence in the verdict. *See Kyles*, 514 U.S. at 434. That Lee's testimony corroborated that given by Hughes makes it unlikely that the jury would have discounted Hughes's testimony altogether, absent some impeachment information of an entirely different kind than that actually presented. Moreover, even aside from this consideration, Hovey's defense strategy did portray the informants as crafty, sophisticated individuals who told the authorities whatever they wanted to hear, and both informants testified about their hopes of securing protection and leniency. Given that the defense impeached the informants' credibility to this extent and the jury still convicted Hovey, it is not reasonably probable that the additional evidence of actual leniency with regard to one of the two informants would have altered the outcome of the trial.

Similarly, the prosecution's failure to correct Hughes's false testimony about prosecutorial promises and the timing of the Alameda County deal does not demonstrate a reasonable likelihood that the false testimony could have affected the jury's guilty verdict. The jurors heard ample evidence about Hughes's criminal record and his pending burglary charges. The defense had put on an already strong case showing that Hughes was a sophisticated actor who was manipulating the State for his own gains. His hope of receiving lenient treatment in exchange for his testimony against Hovey was no secret. Hughes himself told the jury that he "hope[d] [he]

would not be sent to prison." Furthermore, in his closing argument, defense counsel characterized the testimony of Hughes and Lee as "unreliable" in light of the fact that they were both "trying to dig information out of [Hovey] for their own good." We cannot see how learning that his hope was based on a promise of a letter or phone call from Meloling or on the Alameda County D.A.'s promise to do what he could to help Hughes would affect the jury's assessment of the evidence before it, nor do we see how learning that Hughes had not yet made a deal with the D.A. at the time he talked to Hess would have affected the jury's assessment of Hughes's credibility.

**[14]** Even considering the prosecution's conduct with respect to these three matters cumulatively, the materiality requirement is not met. Despite the prosecution's impropriety, we conclude that disclosure of this evidence would not have altered the outcome of the trial. Because the prosecution's suppression of evidence and failure to correct false testimony was immaterial, it does not rise to a due process violation under *Brady* and *Napue*.

## E. Other Prosecutorial Misconduct in the Guilt Phase

We reject Hovey's claims that the prosecution's charge of lewd and lascivious conduct, as well as the prosecution's use of "irrelevant but emotionally compelling" evidence at the guilt and penalty phases, violated due process. Hovey argues that this misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Even if the prosecution's actions were inappropriate, they do not rise to the level of a due process violation that merits reversal of Hovey's conviction.

### 1. Lewd and Lascivious Special Circumstance

Hovey contends that the prosecution violated his right to due process in charging that Hovey killed Tina Salazar during

the commission of a lewd and lascivious act despite its knowledge that it could not prove the corpus delicti of the crime independent of Hovey's admissions to the informants. We disagree.

Prosecutors have broad discretion in determining whether to bring charges against a criminal defendant and which charges to bring. "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Accordingly, it is improper for a prosecutor to bring charges against a criminal defendant in the absence of probable cause. How much evidence is required to constitute probable cause sufficient to charge a criminal defendant, however, is not clear. California cases have defined probable cause to charge or indict as "some rational ground for assuming the possibility that the offense charged has been committed and the accused is guilty of it." *People v. Aday*, 226 Cal. App. 2d 520, 526-27 (Ct. App. 1964).

In this case, Lee testified at the pretrial hearing that Hovey had said that he "liked to pick [girls] up and take them out and play with them," and that Hovey admitted to "playing" with Salazar, which Lee explained to mean "feeling her body." At the time of charging, Hughes had also given a statement suggesting that Hovey had molested or attempted to molest Salazar. Based on these statements, the prosecution had "some rational ground for assuming the possibility" that Hovey had committed a lewd and lascivious act. Under California law, lewd and lascivious conduct does not require penetration, the molestation of any particular body part, or the touching of bare skin. *People v. Martinez*, 11 Cal. 4th 434, 444-45, 452 (1995) ("[S]ection 288 is violated by 'any touching' of an underage child accomplished with the intent of arousing the sexual desires of either the perpetrator or the child."); *see also* Cal. Penal Code § 288. Accordingly, the lack of physical evi-

dence of molestation did not eliminate the possibility of securing a conviction for committing lewd and lascivious conduct. Moreover, the speculation in the teletype that "[i]nterrupted sexual molestation is a possibility" provided additional support for the possibility that Hovey was guilty of committing the lewd and lascivious conduct that was charged.

Hovey argues that California law at the time required that "the corpus delicti must be established before extrajudicial statements and admissions of a defendant are admissible in evidence," *Hall v. Superior Court*, 120 Cal. App. 2d 844, 847 (Dist. Ct. App. 1953) (internal quotation marks omitted), and that the prosecution could not prove the corpus delicti of the lewd and lascivious conduct special circumstance independent of Hovey's statements to the informants. But at the time of charging, the law was unclear regarding whether the corpus delicti rule applied to felony-based special circumstances; it was only in 1984, after Hovey was convicted, that the California Supreme Court clarified that the corpus delicti of a special circumstance must be established independently of the defendant's extrajudicial statements. *People v. Mattson*, 37 Cal. 3d 85, 93-94 (1984) (applying the corpus delicti rule to felony-based special circumstances and declaring that any statement to the contrary in previous cases was overruled), *superseded by statute*, Cal. Penal Code § 190.41, *as recognized in People v. Mickle*, 54 Cal. 3d 140, 179 n.22 (1991).

**[15]** Even had the law been clear at the time, Hovey's claim would fail. The improper charging of the lewd and lascivious conduct special circumstance does not rise to the level of an error that "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 643. As the Supreme Court held in *Donnelly,* we must evaluate the impact of the prosecutor's potentially prejudicial misconduct in the context of the entire trial. *See id.* at 645. When defense counsel moved to strike the special circumstance, the prosecution conceded the issue. Moreover, the trial judge specifically stated that she would have admitted any

allegations that Hovey molested Salazar as relevant to motive even absent the special circumstance charge. Therefore, Hovey was not denied due process by the inclusion of this charge.

## 2.  Emotionally Compelling Evidence

The district court did not err in rejecting Hovey's claim that the prosecution denied him due process by using a portrait of Tina Salazar and relying on her mother's identification, or by using a mannequin resembling Salazar, or by the prosecutor's statement that Hovey had kidnapped Salazar to "sexually molest" or "rape" her.

Under "the narrow [standard] of due process," in contrast to the "broad exercise of supervisory power," relief is not appropriate in situations where, for example, the prosecutor's conduct "did not manipulate or misstate the evidence" or "implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Darden*, 477 U.S. at 181-82 (internal quotation marks omitted). Hovey points to prosecutorial conduct that indeed may have "reflect[ed] an emotional reaction to the case," and that may have been "improper," "undesirable" or "even universally condemned," but this conduct did not deprive Hovey of a fair trial. *See id.* at 180-81 (noting that egregiousness of prosecutor's actions "is not enough" to satisfy high standard of due process violation).

Hovey asks us to overturn his conviction because the prosecution's reliance on the portrait and on Salazar's mother's identification of it indicated that the State was "urg[ing] the jury to convict appellant of first[ ]degree murder and impose death because his victim was a young girl." Although we agree with his contention that the photograph was irrelevant to any issue in dispute at trial, Hovey fails to recognize the very high standard for proving a due process violation in circumstances such as these. Even if there are no permissible inferences the jury can draw from the evidence in question,

due process is violated only if the evidence is "of such quality as necessarily prevents a fair trial." *Jammal v. Van de Kamp*, 926 F.2d 918, 920 (9th Cir. 1991) (internal quotation marks omitted). We have held that admission of far more inflammatory evidence did not violate due process. *See, e.g.*, *United States v. Boise*, 916 F.2d 497, 504 (9th Cir. 1990) (as amended) (autopsy photographs); *Batchelor v. Cupp*, 693 F.2d 859, 865 (9th Cir. 1982) (photographs of the victim's body). Here, the jury was already well aware that the victim was a young girl, and ample evidence was presented as to the circumstances of the crime. Hovey fails to show how reminding the jury of the age of the victim could have prevented a fair trial.

Hovey also claims that a new trial is warranted because, during closing argument, the prosecutor presented to the jury a mannequin resembling the victim, dressed as the victim was when she was killed, with her hands and legs tied in rope and with a bag over her head. In granting summary judgment, the district court noted that it is not clear what standard the court should apply in assessing Hovey's claim that the prosecution's use of the mannequin violated due process, as the mannequin was neither argument nor evidence. Ultimately, the district court properly determined that the *Darden* standard, "so infected the trial with unfairness as to make the resulting conviction a denial of due process," was appropriate. *Darden*, 477 U.S. at 181.

**[16]** As the district court held, even though the mannequin may have affected the jury emotionally, that impact was not so unfair as to amount to a due process violation. The prosecution had a tactical reason for using the mannequin, as it illustrated the victim's size relative to Hovey, a comparison that was relevant to whether the defense's panic theory was reasonable. Even setting aside the prosecutor's purported rationale for using the mannequin, Hovey fails to show that use of the mannequin rendered his trial unfair. There was no misstatement or manipulation of the evidence, nor was there

any conduct that directly implicated any of Hovey's constitutional rights. Like the photograph of Tina Salazar, the impact of the mannequin on the jury cannot be said to be so great or so prejudicial as to amount to a due process violation.

On the other hand, the prosecution's statement during closing that Hovey had kidnapped Salazar in order to "rape" her was a clear manipulation of the evidence. The prosecution made this claim at a point when the lewd and lascivious conduct charge had been withdrawn. Moreover, even if there was circumstantial evidence that Hovey either intended to or did molest Salazar, there was no indication that he intended to or attempted to rape her.

[17] In evaluating a petitioner's claim regarding comments by the prosecution, we have evaluated the fairness of a trial under *Darden* by considering, inter alia, "(1) whether the prosecutor's comments manipulated or misstated the evidence; (2) whether the trial court gave a curative instruction; and (3) the weight of the evidence against the accused." *Tak Sun Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005), *cert. denied*, 126 S. Ct. 1066 (2006). Although the prosecutor's statement was an improper manipulation of the evidence, the jury was instructed that statements by counsel were not to be taken as evidence, and the evidence against Hovey, as we have discussed, was considerable. Moreover, as the district court noted, the jury was aware that there was no evidence of rape. Again, therefore, this misconduct does not give rise to a due process violation. As to the prosecutor's statement that Hovey kidnapped Salazar to molest her, the jury had heard testimony from the informants that Hovey had admitted to "playing with" and "feeling" Salazar. Thus, this comment did not have the potential to mislead the jury and did not misrepresent evidence.

\*\*\*

Accordingly, we reject Hovey's claims of error in the guilt phase. The district court correctly determined that neither any

individual error nor cumulative error was sufficient to merit reversal of Hovey's conviction.

## IV.    Penalty Phase

### A.    Ineffective Assistance of Counsel

Hovey argues that he received ineffective assistance of counsel during the penalty phase because his attorney failed to adequately investigate and present evidence of Hovey's mental condition at and around the time of his crime. Hovey contends that counsel failed to provide his psychiatric expert, Dr. Satten, with key information about Hovey's mental health history and failed to adequately prepare Dr. Satten to testify. As a result, the testimony of his key penalty-phase witness was undermined, and his mitigation case was substantially prejudiced. The district court concluded that although counsel's performance was deficient, Hovey was not prejudiced by the deficiency. For the reasons discussed below, we disagree with the district court's prejudice analysis, and we conclude that Hovey is entitled to habeas relief on this claim.[2]

### 1.    Background

During the penalty phase, Hovey presented eighteen witnesses, including twelve friends and three family members, who described him as a well-meaning and introspective young man from an unexceptional middle-class family. Hovey attended the University of California at Davis and the College of Chabot, and had been living at home and working sporadically at the time of the Salazar murder. Witnesses described his behavior in the months leading up to his crimes as increasingly eccentric.

---

[2]Hovey also claims that during the evidentiary hearing, the district court erred in excluding testimony from a second psychiatric expert, Dr. Kormos, regarding prejudice that may have resulted from Dr. Satten's lack of preparation in Hovey's trial. Because we grant relief from the penalty phase verdict, we need not reach this issue.

Dr. Satten was Hovey's main penalty-phase witness. The bulk of his direct testimony repeated what Hovey had told him about the Salazar murder during the course of several interviews. Dr. Satten testified that in his professional opinion, at the time of the Salazar murder Hovey suffered from schizophrenia. He stated that Hovey first showed signs of mental illness in college, and that his illness became increasingly severe over time, particularly following the death of an adolescent girl Hovey had befriended named Paris.

Dr. Satten described Hovey's symptoms, including disturbances in perception, possible auditory hallucinations, disordered thinking (such as grandiose delusions about his selective breeding theories and his discovery of a cure for cancer), and disturbances in volition (such as his inability to finish things he started, irritability, aggressiveness, and loss of control). Dr. Satten opined that Hovey's illness affected his actions on the day of the Salazar offense. He further testified that Hovey was prone to drift into fantasies linked to his fear of adult women and his relative comfort with young children; that at the time of the crime Hovey was suffering from the effects of Paris's death and attempting to cope with pressure from his mother to become independent; and that Hovey's schizophrenia caused him to panic after kidnapping Salazar. Dr. Satten opined that "in this panic I believe [Hovey] totally lost control of himself."

## 2.   Discussion

A defense attorney in the sentencing phase of a capital trial has "a professional responsibility to investigate and bring to the attention of mental health experts who are examining his client[ ] facts that the experts do not request." *Wallace v. Stewart*, 184 F.3d 1112, 1116 (9th Cir. 1999); *see also Caro v. Woodford*, 280 F.3d 1247, 1254 (9th Cir. 2002). Regardless of whether a defense expert requests specific information relevant to a defendant's background, it is defense counsel's "duty to seek out such evidence and bring it to the attention

of the experts." *Wallace*, 184 F.3d at 1118. To obtain relief, Hovey must demonstrate both that counsel's performance was deficient and that he was prejudiced by that deficiency. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Prejudice exists if, "absent the errors, there is a reasonable probability that the jury 'would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " *Boyde v. Brown*, 404 F.3d 1159, 1180 (9th Cir.) (quoting *Strickland*, 466 U.S. at 695), *as amended*, 421 F.3d 1154 (9th Cir. 2005).

Hovey's penalty-phase mitigation evidence fell into four categories: (1) Hovey's mental illness; (2) his generosity, kindness, and capacity for friendship; (3) his intelligence, scientific knowledge, artistic creativity, and industriousness; and (4) his post-crime conduct in prison. Evidence of Hovey's mental disorder, which came almost entirely from the testimony of Dr. Satten, was the heart of Hovey's mitigation case. Hovey contends that counsel made almost a dozen significant omissions in providing documents to and preparing Dr. Satten to testify. We discuss only the most serious of these errors.

As the district court acknowledged, counsel's performance was deficient: There was no valid tactical reason for failing to supply Dr. Satten with at least some of this information. We therefore address whether this deficient performance prejudiced Hovey.

### a.    Chope Hospital Incident

One year before Tina Salazar's murder, Hovey was hospitalized following what may have been a schizophrenic episode. After walking from downtown San Francisco to the San Francisco International Airport to find his father, who worked at the airport, Hovey broke into a parked car and was arrested. Hovey was taken to Chope Hospital in San Mateo, where doctors noted that he was "catatonic," was "not oriented to place," and had a flat affect. Hovey spent more than two days

at Chope, where he was administered Valium and Haldol, a medication used to treat schizophrenia. Doctors believed Hovey may have had an acute schizophrenic episode, and a letter Hovey's father later sent to defense counsel stated that Hovey's attending psychiatrist at Chope had made a tentative diagnosis of catatonic schizophrenia. Hovey's discharge summary states that he was diagnosed as having "1. Toxic psychosis—drug. 2. Personality disorder—other (borderline)."

Defense counsel never provided the Chope records to Dr. Satten. Had he done so, the records would have strengthened Dr. Satten's diagnosis of schizophrenia because the recorded observations were consistent with and to some extent confirmed his diagnosis, as Dr. Satten later testified in these proceedings. Dr. Satten also would have been able to testify that Hovey had a history of mental illness, including symptoms of schizophrenia, that began before the kidnapping incidents, and that his mental illness was serious enough to require hospitalization and treatment. Most significantly, the records would have corroborated Dr. Satten's testimony and bolstered the credibility of his response to the prosecution, whose primary strategy in attacking Dr. Satten was to suggest that Hovey had never suffered from mental illness. As Dr. Satten testified before the district court, the Chope records would have provided evidence "that it was not me alone, or me and [the] psychologist . . . I had chosen, that came up with the diagnosis, but there was evidence of it from other people who were not connected with the defense."

Instead, the prosecution was able to suggest convincingly that Dr. Satten had fabricated his diagnosis of Hovey. The prosecution elicited testimony from Dr. Satten that, as far as he knew, Hovey had never been treated by a psychiatrist or other physician for a mental condition or prescribed any medication related to his mental health before his arrest. The prosecutor ably undermined Dr. Satten's opinion by pressing on

the absence of the very sort of evidence that Hovey's counsel should have provided Dr. Satten:

Q. Before that time [of the Chope Hospital inci-dent] was [Hovey] ever treated anywhere by any doctor anywhere for any mental condition?

A. He reported that he was examined on one occa-sion following a car accident.

Q. By a doctor?

. . . .

A. By someone who . . . by a counselor.

Q. My question, I think, was, Doctor, whether or not you found any evidence of his ever having been treated by a psychiatrist or a doctor for a mental condition?

A. I did not find any such evidence.

Q. In connection with the incident you say he was placed in a hospital [Chope] for a hospitaliza-tion as a result of the incident involving a car, was any medication prescribed for him to take as a result of that incident?

A. Not to my knowledge.

Q. They do have medication for schizophrenia?

A. They do.

. . . .

Q. And he wasn't put on any, was he?

A. To my knowledge he wasn't.

The prosecutor continued to emphasize the lack of medical support for Dr. Satten's opinion during closing argument:

> [T]he doctor tells you, he arrives at his diagnosis. I remember cross-examination, there is [sic] ways to treat this type of an illness. You give the people medication. Only nobody prescribed anything for the defendant, Richard Hovey. He had never seen a psychiatrist before this time, except that on [sic] somewhat ambiguous period that we don't know much about in San Mateo [*i.e.*, Chope]. He's taking no medicine. That doctor prescribed from that incident, they gave him no medicine, made no diagnosis. . . . And for the last three years, four years, he still hasn't been taking any medication for this exotic mental illness that he has certainly contracted or had, according to the doctor, on March 10th of 1978.

The prosecutor's closing argument, in combination with Dr. Satten's ignorance of Hovey's experience at Chope, strongly suggested that the defense had concocted the mitigating mental illness evidence.

The district court concluded that Hovey was not prejudiced by counsel's failure to provide the Chope information to Dr. Satten because (1) Dr. Satten technically did not testify that Hovey had never been treated for a mental condition, only that he had never been treated prior to the Chope incident; (2) the jury might have interpreted the Chope records as demonstrating that Hovey suffered only from a drug-induced psychosis and that the medication he was administered was prescribed to treat that psychosis and not schizophrenia; and (3) the Chope doctors ultimately concluded that Hovey suffered from drug psychosis or borderline personality disorder, so Dr. Satten would have had to defend the inconsistency of his diagnosis.

These findings are in error. First, as the above excerpt of Dr. Satten's cross-examination demonstrates, while the prosecutor asked at one point whether Hovey had been treated for a mental condition before the Chope incident, he later asked the same question without limitation as to time. The overall impact of the prosecution's questions and Dr. Satten's responses was to suggest that Hovey had never been treated for or prescribed medication for mental illness. Had jurors known that Hovey had been under observation for a psychotic episode, had displayed symptoms of schizophrenia, had been prescribed medication to control psychosis, and ultimately had been diagnosed with a mental disorder, they would have been faced with a strikingly different and more accurate picture of Hovey's mental condition at the time of the Salazar assault. This evidence, coming as it did from doctors who had no connection to the defense or incentive to invent a diagnosis and thus who were invulnerable to charges of fabrication, could very well have made the difference in a life as opposed to death verdict.

Second, while the Chope records contain evidence suggesting that Hovey might have suffered from a drug-induced psychosis, that evidence is inconclusive. Hovey claimed that he found and smoked a "reefer" that "must have had PCP in it" on the morning of the Chope incident, but his drug test at Chope came back negative. During these proceedings, Dr. Satten explained that Hovey may have made up the PCP story to explain his psychosis, because it was highly unlikely that he would have happened upon PCP in the street. In any case, the Chope records show both that Hovey displayed symptoms consistent with Dr. Satten's diagnosis and that doctors believed that Hovey might have experienced an "acute schizophrenic episode." Furthermore, the letter from Hovey's father, which counsel also failed to give Dr. Satten, indicates that a doctor at Chope tentatively diagnosed Hovey with catatonic schizophrenia. "[A]ll potentially mitigating evidence is relevant at the sentencing phase of a death case, so . . . mental

problems may help even if they don't rise to a specific, technically-defined level." *Wallace*, 184 F.3d at 1117 n.5.

Finally, during deliberations the jury specifically requested that Dr. Satten's testimony be re-read, suggesting that the jury placed importance on it. The portions of the transcript re-read to the jury included Dr. Satten's assessment of how Hovey's mental illness affected his actions at the time of the crime, as well as his cross-examination testimony suggesting that Hovey had never been prescribed medication for mental illness.

### b.  Circumstances Surrounding the Amy Guard Kidnapping

Counsel also failed to provide Dr. Satten with important information about the circumstances surrounding the Amy Guard kidnapping. This information would have prevented the prosecutor from portraying Dr. Satten as ill-prepared and foolish and thereby impugning his medical conclusions. Because Dr. Satten was not adequately prepared, the prosecution was able to demonstrate that Dr. Satten was completely ignorant of several important facts, including that Hovey was regularly and successfully attending a training school at the time of the Salazar murder, that Hovey altered his appearance after the Salazar murder and before the Guard kidnapping, and that Hovey released Amy Guard only after being discovered and pursued by two witnesses to his crime:

> Q.  Now, [Hovey] told you that he picked up Amy Guard and that he intended to—voluntarily release her, didn't he?
>
> A.  Yes.
>
> Q.  Did he tell you that the reason he released her was that he and Amy Guard were found by two persons that pursued them? Did he tell you that?

A.  No.

. . . .

Q.  [O]n the date of this killing [the Salazar mur-
    der], he was enrolled in a training school in the
    area where this killing took place. Are you
    aware of that?

A.  No.

Q.  And this particular day happened to be a day
    when this school was not in session, Friday; but
    4 days before that, he was in school every day.
    Are you aware of that?

A.  No.

Q.  Are you aware the following week he was in
    school every day? Are you aware of that?

A.  No.

Q.  Are you aware of the fact that he completed that
    period of training at that training school suc-
    cessfully and was then placed in the Qume Cor-
    poration?

A.  No.

Q.  Are you aware that after the commission of the
    crime of murder, that Richard Hovey, this
    defendant, altered his appearance? Are you
    aware of that?

A.  No.

Q. Pardon me, Doctor. You were not told that Mr. Hovey changed his appearance . . . ? [You] were not told that?

A. No, I was not told that.

The prosecution further capitalized on Dr. Satten's ignorance of important information during closing argument:

Do you remember the doctor, Doctor Satten, told you that he made his diagnosis based on what the defendant told him, based on a short conversation with the parents and the brothers and based on reading, reading, not talking to, reading the reports of the witnesses . . . .

. . . .

He didn't think it was important that just shortly after [the Salazar murder], the defendant again goes out fully prepared to kidnap a child, having gone through an elaborate process of changing his appearance, getting a new car, disposing of the old car . . . . That wasn't important. That wasn't important. After all, the defendant said he let her go, to the doctor, and that's what the doctor used in his evaluation of what the defendant was thinking at the precise moment when he's beating her to death, Tina to death.

[18] We disagree with the district court's conclusion that although Dr. Satten's credibility "undoubtedly" suffered, counsel's failure to provide this information was not prejudicial. Because Dr. Satten's testimony was the heart of Hovey's mitigation case, and because the prosecution's counterstrategy was to attack the soundness of Dr. Satten's medical conclusions and the bases for them, there is a reasonable probability that Dr. Satten's ignorance of basic background

facts related to the Guard kidnapping affected the jury's sentencing decision.

The clear implication of the prosecution's argument was that Dr. Satten was uninformed about the subject of his diagnosis and that his conclusions stemmed from a general misunderstanding of the facts. Even if the background information did not change Dr. Satten's diagnosis, he at least would have been able to testify more knowledgeably about the case and better weather the prosecution's attempts to discredit him. He would have been able to anticipate the prosecution's questions during cross-examination and explain how Hovey's activities around the time of the offense could be consistent with a diagnosis of schizophrenia. Instead, Dr. Satten was caught by surprise, in an embarrassed and vulnerable situation. He was entirely discredited by his lack of critical information, information that lay in the hands of Hovey's counsel. *Cf. Bean v. Calderon*, 163 F.3d 1073, 1080-81 (9th Cir. 1998) (finding prejudice where counsel failed to adequately prepare mental health experts, whose testimony was, as a result, "less than persuasive at best . . . and a seeming artifice at worst" (internal quotation marks omitted)).[3]

### c.   Conclusion

"[A] penalty phase ineffective assistance claim depends on

---

[3]Hovey was also prejudiced by his counsel's failure to provide Dr. Satten with a probation report prepared by the Albany Police Department after he pled guilty to the Guard kidnaping and by his counsel's decision not to elicit testimony from Dr. Satten about records from Fairmont Hospital, where Hovey was sent several times during his post-arrest incarceration. These documents contain observations of Hovey's behavior by medical professionals, including descriptions of his delusions and grandiose ideas, that are consistent with Dr. Satten's observations and diagnosis. Although the documents report diagnoses of schizoid personality disorder rather than schizophrenia, they would have helped demonstrate to the jury that whatever the precise diagnosis, medical professionals repeatedly had concluded that Mr. Hovey was seriously mentally disturbed.

the magnitude of the discrepancy between what counsel did investigate and present and what counsel could have investigated and presented." *Stankewitz v. Woodford*, 365 F.3d 706, 716 (9th Cir. 2004). Here, counsel failed to adequately prepare Dr. Satten, paving the way for the prosecution's devastating cross-examination of the most critical mitigation witness. Counsel also failed to provide Dr. Satten with important documents that would have demonstrated that Hovey had suffered mental health problems serious enough to require hospitalization and medication, thus further bolstering the credibility of Dr. Satten's independent conclusions. The state trial court's own response to Dr. Satten's testimony (provided in the course of ruling on Hovey's automatic motion to modify the verdict at the end of trial) reveals the extent of the damage to Dr. Satten's credibility. The trial court stated that as a result of Dr. Satten's seemingly inaccurate and inconsistent statements, the court did not "attach any significance to [Dr. Satten's] opinion."

**[19]** Given that Dr. Satten's testimony was the sole vehicle for presenting robust evidence about Hovey's mental condition, and given that the jury appears to have considered the psychiatric testimony important, as demonstrated by its request that portions of Dr. Satten's testimony be re-read, the destruction of Dr. Satten's credibility almost certainly harmed Hovey's mitigation case. The jury was left with the erroneous impression that Hovey had never been treated for a mental illness before committing his crimes, that Hovey may have fabricated a mental illness to obtain mercy at sentencing, and that Hovey's psychiatric expert based his conclusions on a substantially incomplete understanding of the facts. With Hovey's main mitigation witness undermined, Hovey's mitigation case was left to rest on the unremarkable testimony of his family and friends that he had been a well-meaning, introspective, and harmless young man, as well as forward-looking

mitigation evidence, which the jury may have believed it could not consider.[4]

The aggravating evidence in Hovey's case was strong, but it was not so overwhelming as to preclude the possibility of a life sentence. Heinous crimes do not make mitigating evidence irrelevant. *See, e.g.*, *Smith v. Stewart*, 189 F.3d 1004, 1013 (9th Cir. 1999); *Hendricks v. Calderon*, 70 F.3d 1032, 1044 (9th Cir. 1995) (as amended). Hovey had no history of serious violent crimes before the Salazar murder, and neither that murder nor the Guard kidnapping suggests a proclivity for violence against adult, male prisoners or prison personnel, were he sentenced to life without parole instead of death. Indeed, despite the horrific nature of Hovey's crime, it appears that the jury seriously considered a sentence of life without parole. Four of the five questions the jury asked the court during deliberations concerned the history of the death penalty in California (Question 1), the possibility that Hovey might be paroled in later years if he were sentenced to life imprisonment without parole (Questions 2 and 3), and whether death penalty determinations are reviewed by appellate courts (Question 4). *Cf. Stankewitz*, 365 F.3d at 724-25 (concluding that because a capital jury asked whether "anyone sentenced to confinement in a state prison for life without possibility of parole has been put before a parole board," the jury "did not regard a death sentence as a foregone conclusion" (internal quotation marks omitted)).

[20] Dr. Satten's testimony was the principal component of Hovey's mitigation case. Counsel's egregiously deficient performance in preparing Dr. Satten substantially weakened the doctor's testimony and enabled the prosecution to destroy his

---

[4]Hovey argues that the trial court's jury instructions improperly restricted the jury's consideration of forward-looking mitigating evidence. In light of our conclusion that Hovey is entitled to habeas relief for his counsel's ineffective assistance in the penalty phase, we do not address this argument. *See infra* p.9509.

credibility on cross-examination. Had counsel correctly prepared Dr. Satten, there is a reasonable probability that Hovey's jury would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. We accordingly reverse the district court's denial of habeas relief on this claim.

## B.   Unconstitutional Imposition of Death Penalty

Hovey also contends that the death penalty was unconstitutionally imposed in his case, based on (1) the prosecution's use of inflammatory evidence and argument in the penalty phase, (2) the trial court's failure to direct the jury to consider Hovey's mental illness evidence as mitigating, (3) improper restrictions on the jury's consideration of mitigating evidence, (4) the trial court's unresponsive answer to jury questions about the sentence of life without parole, and (5) the absence of procedural safeguards governing the imposition of the death penalty. In light of our conclusion that Hovey is entitled to habeas relief for his counsel's ineffective assistance in the penalty phase, we need not reach these additional claims.

## V.   Conclusion

For the foregoing reasons, we affirm the district court's denial of habeas relief as to Hovey's conviction and each of its underlying rulings. We reverse the district court's denial of habeas relief as to Hovey's death sentence. Because Hovey received ineffective assistance of counsel at the penalty phase, we remand to the district court with instructions to grant the petition for a writ of habeas corpus as to Hovey's death sentence unless the State grants Hovey a new penalty-phase trial within 120 days of the district court's order.

The judgment of the district court denying the petition as to Hovey's conviction is **AFFIRMED**. The judgment of the district court denying the petition as to Hovey's death sentence is **REVERSED**. The case is **REMANDED** to the dis-

trict court for entry of an appropriate order for a penalty-phase retrial, if the State elects to seek such a retrial.